

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2014**

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-RLJ-11 |
| | § | |
| Debtor. | § | |

___

| | | |
|---|---|---|
| WALTER O'CHESKEY, Liquidating Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 11-02014 |
| | § | |
| GREYSTONE SERVICING CORPORATION, | § | |
| INC., AHF DEVELOPMENT, LTD., JOHN | § | |
| DOES 1-50, and ABC ENTITIES 1-50, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

I.

This summary judgment concerns $1,125,620 of alleged avoidable transfers from the debtor, American Housing Foundation ("AHF"), to the defendant, Greystone Servicing Corporation, Inc. ("Greystone"). The parties do not dispute the amount at issue. The transfers were made in connection with three transactions: $550,214 made in connection with a loan made by Greystone to an entity, Amagard LTD; $514,732 made in connection with a loan originally made by a predecessor to Greystone, TRI Capital Corporation ("TRI Capital"), to AHF Highland Oaks Community Development, LLC ("Highland Oaks"); and $60,674 made in connection with a loan from another predecessor to Greystone, Malone Mortgage Company America, Ltd., to AHF Hurst Manor Community Development, LLC ("Hurst Manor"). In both the Highland Oaks and Hurst Manor deals, the loan instruments (the notes and mortgage documents and rights flowing from such instruments) were ultimately endorsed and assigned to Greystone.

The transfers at issue were all payments made by, allegedly, AHF and are said to be fraudulent because AHF was not legally obligated to make the payments: it never received anything of value, i.e., consideration, either prior to or in return for the transfers. The plaintiff, Walter O'Cheskey (the "Trustee"), contends that some of the transfers constitute preferential payments under the Bankruptcy Code, as well.

A.

The Amagard transaction involved a $3.319 million loan that was to be made by Greystone to Amagard LTD.[1] The original loan commitment was issued in June 2007, was extended, and then ultimately failed to proceed to closing. According to Greystone, it was paid

---

[1] The original loan commitment was for $3,000,00, but it was later amended to $3,319,000 on November 14, 2007.

$781,550 in deposits and fees associated with the loan commitment. Greystone refunded $30,000 of the deposits which were, per the instructions of an AHF employee, Glenda David, delivered to Mid-Continent Community Development Corporation, a company owned by AHF. To resolve a dispute between Amagard and Greystone that arose from the failed consummation of the loan, Greystone refunded $166,336.75 that it previously received to Amagard[2] in return for a release of all claims.

The Amagard-related transfers took place from August 10, 2007 to December 19, 2008, with approximately nine transfers made during this time frame. According to the Trustee, three payments totaling $248,480 took place *prior to* May 1, 2008, before AHF acquired any ownership interest in Amagard LTD; and six transfers, totaling $468,070, were made after May 1, 2008, *after* AHF acquired an ownership interest in Amagard LTD. Against the total transfers of $716,550,[3] the Trustee has credited $166,336 paid at the time of the Amagard settlement. The difference of $550,214 constitutes the transfers subject of the Trustee's causes of action.

Greystone submits that the Trustee's causes of action concerning the transfers made by AHF in connection with the Amagard loan commitment are specifically covered by the Amagard release, which therefore bars the Trustee's claim here.

---

[2]Greystone's records indicate the refund was actually issued to an AHF account [GSC-APP000148].

[3]Though Greystone was paid $781,550, the Trustee contends that $65,000 of this is related to another transaction, not the Amagard transaction. This results in a total of $716,550 that was paid on the Amagard loan. It is the Court's understanding that the parties do not dispute this point.

B.

Both the Highland Oaks and the Hurst Manor deals arose from so-called HUD-insured loans.[4] In both transactions, a prior holder of the instruments—prior to Greystone—transferred and assigned "all but nominal title" to Ginnie Mae[5] (or GNMA) as part of the issuance of mortgage-backed securities, i.e., bonds secured by mortgages on real estate. The deals and the issues raised go well beyond a simple lending arrangement, however.

Highland Oaks was a limited liability company formed in November 1998; it owned and operated the Highland Oaks Apartments. AHF was its only member and 100% owner. The apartment complex was encumbered by a deed of trust that secured a $9.3 million loan from TRI Capital to Highland Oaks in April 1999. Behind the Highland Oaks loan, an entity named Nortex Housing Finance Corporation issued bonds under a bond offering. Bank One Texas, N.A. served as the Bond Trustee. The proceeds realized from the bond issue were then loaned to TRI Capital; it then made the loan to Highland Oaks. TRI Capital was then obligated to repay the Bond Trustee, such obligation itself constituting a security. The bond proceeds were used by TRI Capital to fund the mortgage loan to Highland Oaks.

TRI Capital's obligation to the Bond Trustee was secured or "backed" by the note and deed of trust mortgage. It was thus referred to as a "Mortgage Backed Security." The note and deed of trust mortgage were sold—at least two times—with Greystone as the last and present holder of the note and deed of trust mortgage. Greystone, thus standing in TRI Capital's shoes,

---

[4]The loans were insured by the Federal Housing Administration of the United States Department of Housing and Urban Development (the "FHA" or "HUD").

[5]"Ginnie Mae" refers to the Government National Mortgage Association. Ginnie Mae is a "wholly owned corporate instrumentality" of the United States through the Department of Housing and Urban Development ("HUD").

was then obligated to the Bond Trustee.  As such, its obligation was guaranteed by Ginnie Mae.  As guarantor, Ginnie Mae guaranteed the timely payment of principal and interest to investors, the bondholders, regardless of whether the borrower or "issuer" (defined as the lender—TRI Capital or Greystone) made the payments which it was then obligated to make on its obligation.  When Greystone stepped into the picture, it pledged its interest in the Highland Oaks note receivable and deed of trust mortgage to Ginnie Mae to secure its (Greystone's) obligation to the Bond Trustee.  This constituted a "re-certification of the Ginnie Mae Pool."  Martin Affidavit ¶ 4.  The pledge was accomplished by Greystone's endorsement of the note and deed of trust mortgage in blank.  Such assignment was a collateral assignment: if Greystone defaulted on its obligation to make payments into the account for the Bond Trustee payments, Ginnie Mae could then record the assignment and take ownership of the note and deed of trust mortgage.  (By the same token, if the borrower, Highland Oaks or Hurst Manor, as the case may be, defaulted, Greystone as secured lender could assign the mortgage to HUD and collect insurance proceeds from the mortgage insurance.)

      Highland Oaks defaulted on its mortgage payment to Greystone; Greystone then made payments into the custodial account used for payments to the Bond Trustee.  Greystone was later reimbursed by the transfers from AHF.

      The Hurst Manor deal is conceptually identical.  Hurst Manor was a limited liability company that owned and operated Hurst Manor Apartments; it was formed around September 14, 1998.  AHF was the only member and 100% owner. The property was encumbered by a deed of trust in connection with a note evidencing a loan of $2.995 million from Malone Mortgage Company America, Ltd. to Hurst Manor in November 1998; this loan was insured by

the FHA. The funds for the loan came from the sale of bonds by the Tarrant County Housing Finance Corporation. Malone was obligated to the Tarrant County bondholders via mortgage-backed securities, with Bank One Texas, N.A. serving as the Bond Trustee responsible for making payments to the bondholders as payments were received. Ginnie Mae guaranteed Malone's obligation to the Bond Trustee. Malone pledged the Hurst Manor note and mortgage to Ginnie Mae to secure Ginnie Mae as guarantor; Ginnie Mae only paid on its guaranty if Malone failed to cover a mortgage payment. Malone was obligated to pay on the Hurst Manor MBS regardless of whether or not Hurst Manor paid Malone.

On July 1, 2005, the Hurst Manor note was endorsed and the mortgage assigned to KeyCorp Real Estate Capital Markets, Inc.; KeyCorp then endorsed the note and assigned the mortgage to Greystone on August 1, 2006. Greystone thus stood in the shoes of Malone with the same obligations to make payments to the Bond Trustee.

C.

In essence, Greystone stands in the shoes of the original lender of the HUD-insured loans that were "securitized" by conveyance of the stream of payments that serviced the mortgage-backed bonds (or securities) issued by Ginnie Mae in the securities market. Ginnie Mae served as guarantor of the stream of payments made from its pool. The Court assumes that Ginnie Mae was acquiring streams from multiple other lenders, as well.

Greystone maintained a segregated, custodial account for the principal and interest payments made by the borrowers on the two loans. It thus separately accounted for the transactions—the payments—made on each loan.

Though Greystone was subject to various regulations and rules as a servicer for the HUD-insured loans that became part of the Ginnie Mae mortgage-backed securities, it could, under limited circumstances, withdraw funds from the accounts that it maintained as a way to repay advances it made or fees it incurred.

The principal and interest payments that were made to Greystone and deposited into the segregated accounts set-up for such payments were moved out in the regular course within 48 hours for payments to the bondholders for application against the obligations arising under the bonds they held.

In 2007, in two separate transactions, the Ginnie Mae pool arrangement was terminated upon the repurchase of the two loans. Despite this, Greystone continued as servicer in accordance with the FHA requirements, but the payments passed directly from Greystone to the respective investors and thus no longer passed through the Ginnie Mae pool. In addition, Greystone agreed to process loans to refinance the Highland Oaks and Hurst Manor loans. Greystone filed the loan applications for both Highland Oaks and Hurst Manor; all fees paid in conjunction with this service were placed in an escrow account.[6]

From July 14, 2006 to September 14, 2006, $426,610 was paid, ostensibly by AHF, that was designated by Greystone as "GNMA payments"; on February 9, 2009, $44,722 was paid that Greystone designated as a payment of "Third Party Fees"; and on February 4, 2009, $75,563 was paid to Greystone which it designated as a "Participant Payment." Total payments received by Greystone, therefore, on account of the Highland Oaks and Hurst Manor deals were $546,895.

---

[6]The loan applications were rejected; Greystone then assigned the defaulted loans to HUD for a claim against the FHA mortgage insurance.

II.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and other matters presented to the court show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). On a summary judgment motion, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255. A factual dispute bars summary judgment when the disputed fact is determinative under governing law of the issue before the court. *Id*. at 250. The movant bears the initial burden of articulating the basis for its motion and identifying evidence which shows that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 322. The respondent may not rest on the mere allegations or denials in its pleadings but must set forth specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Greystone first submits that it is entitled to summary judgment on the Trustee's claim regarding the payments to Amagard because, according to Greystone, the release issued in settlement of the Amagard dispute covers any claims of AHF. Second, Greystone submits that the Trustee's claim against it concerning AHF's payments to Greystone on both the Highland Oaks and Hurst Manor loans must fail because Greystone was a mere conduit, and thus not a "transferee," of the payments.

The Court concludes that summary judgment must be denied on both grounds.

A.

AHF was not a party to the release issued in connection with the Amagard settlement. The Amagard release is governed by Texas law as it is a Texas limited partnership. *See In re De La Fuente*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009). For a party to be included in a release, it must be apparent from reading the document that the party is included. A Texas case discussing this so-called "stranger rule" that was put forth by the Texas Supreme Court states that the "requirement of specific identification is not met unless the reference in the release is so particular that a stranger could readily identify the released party." *Stafford v. Allstate Life Ins. Co.*, 175 S.W. 3d 537, 543 (Tex. App.—Texarkana 2005, no pet.) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W. 2d 414, 419 (Tex. 1984)). "One can claim the protection of a release only if the release refers to him or her by name or with such descriptive particularity that his or her identity or connection with the event is not in doubt." *Stafford*, 467 S.W.2d at 543 (citing *Duncan*, 665 S.W.2d at 420). In the *Stafford* case, the release stated that it included any "subsidiaries, affiliates, partners, predecessors and successors in interest and assigns" of Allstate Insurance Company. *Id*. Also in the release were specific references to Allstate Settlement Corporation and Allstate Life Insurance Company, and the court therefore found that even a stranger to the transaction would have little trouble concluding that Allstate Settlement Corp. and Allstate Life Insurance Co. were affiliates since they had similar names and were included in portions of the settlement agreement itself. *Id*.

In 2007 and 2008, FHF Amagard, Inc. was the general partner of Amagard LTD, and the limited partners were Dasadi Holdings and GS Holdings. In May 2008, AHF acquired the stock of FHF Amagard, which owned .01% of Amagard LTD. The Amagard release states that

borrowers include "such entity and its respective past and present parent, affiliates and subsidiaries and each of their respective officers, directors, employees, partners, agents, joint venturers, associates, representatives, successors and assigns." It is highly questionable whether the release would include AHF. While it does mention "parent, affiliates, and subsidiaries," a stranger reading the document would likely consider FHF Amagard as the parent/affiliate. The fact that AHF and Amagard have been considered "affiliates" in other opinions by the Court doesn't mean that in the context of reading the release, it would be apparent to a stranger that AHF was an affiliate.

Many of the cases discussing whether a party is included in a release are in the context of who was effectively released, rather than who was doing the releasing of claims. Accordingly, the question arises if there was authority for AHF's claims to be included in the release. Greystone argues that Steve Sterquell signed the Amagard release and therefore it is clear that he had the authority—as president and founder of AHF—to sign on behalf of AHF. However, upon review of the Amagard release, it is actually Steve Sterquell II, not Steve Sterquell, who signed the Amagard release.

The Court cannot conclude that, as a matter of law, AHF released claims under the Amagard release.

B.

Greystone argues that it was nothing more than a "mere conduit" of the payments made by AHF in both the Highland Oaks and Hurst Manor deals. The Fifth Circuit case, *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138 (5th Cir. 1993), adopts the "dominion or control test" in determining whether an entity is an initial transferee or a mere conduit. This case

discusses with approval the Seventh Circuit case, *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988). Greystone relies on *Bonded*.

In *Bonded*, an individual, Ryan, controlled several so-called currency exchanges. Ryan had borrowed over $600,000 from European American Bank. One of the currency exchanges, Bonded Financial Services, issued a $200,000 check made payable to the bank with a note instructing the bank to deposit the check in Ryan's account. The bank so deposited the check. Ten days later, Ryan instructed the bank to debit his account by the $200,000 and apply the debited amount to his loan at the bank. At the time Bonded issued the check to the bank, Ryan's loan was fully secured and not in default; the bank had no right to even offset the loan against the funds in Ryan's account. "Under the law of contracts, the [b]ank had to follow the instructions that came with the check." *Id.* at 893. The court held that the "minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id*. The court concluded that the bank was not a transferee and thus was a mere conduit at the time it received the check from Bonded.

> It received nothing from Bonded that it could call its own; the Bank was not Bonded's creditor, and Ryan owed the Bank as much as ever. The Bank had no dominion over the $200,000 until January 31, when Ryan instructed the Bank to debit the account to reduce the loan; in the interim, so far as the Bank was concerned, Ryan was free to invest the whole $200,000 in lottery tickets or uranium stocks.

*Id*. at 893–94.

AHF payments here were made on account of the debts owed by its subsidiaries, Highland Oaks and Hurst Manor, *to Greystone*. The Court must infer that such payments were applied to and thus partly satisfied such obligations.

Judge Easterbrook, who authored the *Bonded* opinion, elaborated on *Bonded* in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010). There, addressing the distinction between an initial transferee and a mere conduit, Judge Easterbrook explained that in *Bonded* the court had adopted an approach that "tracks the function of the bankruptcy trustee's avoiding powers: to recoup money from the real recipient of . . . [the] transfers." *LaSalle Bank*, 619 F.3d at 691. He pointed out that the recipient of Bonded's $200,000 transfer was the bank's customer, Ryan, who then had full control over the balance of the checking account. The court further noted that it could not find any appellate decision on the question of whether a trustee for a securitized investment pool is an "initial transferee" under 11 U.S.C. § 550(a), but that there are "lots of decisions [that] hold that an entity that receives funds for use in paying down a loan, or passing money to investors in a pool, is an 'initial transferee' even though the recipient is obliged by contract to apply the funds according to a formula." *Id.* at 692.

The facts vary significantly in the cases on this subject. Somewhat lost in the analysis, however, is the simple fact that the payments to Greystone here were made on obligations owed to Greystone. As between Greystone and Highland Oaks and Hurst Manor (and of course AHF), Greystone could do whatever it wanted with the payments, so long as it applied the payments to the Highland Oaks and Hurst Manor obligations to Greystone.

Greystone also relies on the case of *Jensen v. Washington Mutual, F.A. (In re General Mortgage Corporation of America, Inc.)*, 384 B.R. 617 (Bankr. M.D. Fla. 2008), in which the court held that the defendant bank was a mere conduit because it simply received mortgage payments from the debtor that were in turn transferred to the actual lender pursuant to the terms of its servicing agreement. *Id.* at 619. The court there was not dissuaded by the fact that the

debtor had no contractual relations with the ultimate assignee of the loan. But *Jensen* is inapposite. It is clear from the facts there that the bank was merely a servicing agent as the loan had been sold. Here, at the time AHF paid Greystone, Highland Oaks and Hurst Manor were still obligated to Greystone, and Greystone was still the lender as to Highland Oaks and Hurst Manor. It was obviously compelled to apply such payments against the debts of Highland Oaks and Hurst Manor. Once it credited such payments, it could, as between it and its debtors, do whatever it pleased with the funds. This is the very principle recognized by the court in *Bonded*. Greystone benefitted on both ends—upon receipt and application of the funds against the debtor's accounts and upon payment against *its debt* to the bond trustee acting on behalf of the bondholders. Funds are fungible; the obligations and rights between Greystone and its counterparties on either side of the money flow are not.

Upon the summary judgment evidence before it, the Court concludes that Greystone was not a mere conduit and thus summary judgment is denied.

### End of Memorandum Opinion ###